IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MELISSA TROTTER,                    :

    Plaintiff,                     :

vs.                                 :   CIVIL ACTION 06-0183-WS-M

CORRECTIONAL MEDICAL SERVICES,      :
INC., et al.,
                                 :

    Defendants.

<u>REPORT AND RECOMMENDATION</u>

Plaintiff, an Alabama prison inmate proceeding <u>pro</u> <u>se</u> and <u>in</u> <u>forma</u> <u>pauperis</u> filed a Complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the Motion for Summary Judgment of Defendants, Correctional Medical Services, Inc. ("CMS"), Marc Sonnier, M.D., and Michael Brown (Docs. 29, 30, 31, 39, 40), and Plaintiff's Opposition thereto  (Docs. 22, 34, 62, 64).  After consideration of these pleadings, and for the reasons set out below, it is recommended that the Motion for Summary Judgment of Defendants CMS, Sonnier, and Brown be granted and that Plaintiff's action against these Defendants be dismissed with prejudice.

<u>I.  SUMMARY OF FACTUAL ALLEGATIONS</u>

From its review of the record, the Court summarizes the parties' allegations that are material to the issues addressed in this Report and Recommendation.  At the time of the incident made the basis of this litigation, Plaintiff was an inmate

incarcerated at the Mobile County Metro Jail ("Metro Jail").
(Doc. 8 at 2).  Plaintiff was arrested on August 12, 2005, for
possession of a forged instrument and for violating the terms of
her probation.  (Doc. 31, att. 4 at 1).  Upon arrival at the
Metro Jail, Plaintiff disclosed to jail personnel that she was
pregnant and that she had a history of seizures, high blood
pressure, and a psychiatric disorder.  (Doc. 31, att. 3 at 2).
Plaintiff also reported that she was allergic to one medication,
Keflex.  (Id. at 2-3).

Within five hours of Plaintiff being booked into the Metro
Jail, CMS staff conducted a medical history and screening and
administered a pregnancy test, which was positive.  (Id. at 3).
Based on Plaintiff's history of seizures, CMS prepared a notice
of administrative segregation, which allowed her to be housed in
a bottom floor cell with a bottom bunk.  (Id.).

The following day, August 13, 2005, Defendant Dr. Sonnier
prescribed Dilantin for Plaintiff's seizure disorder.  (Id. at
3).  Two days later, on August 15, 2005, Dr. Sonnier examined
Plaintiff for lower back pain and ordered a urinalysis to
determine if Plaintiff had a bladder infection.  (Id.; Doc. 31,
att. 2 at 2).  The urinalysis proved to be negative.  (Id.). Dr.
Sonnier also examined Plaintiff's pelvic area and uterus and
found them to be normal.  (Doc. 31, att. 2 at 2).

On August 17, 2005, four days after Plaintiff began taking

2

Dilantin, she began to itch severely, and she stopped taking the medication. (Doc. 8 at 2). On August 24, 2005, another CMS physician, Dr. Adolph Isom, referred Plaintiff to an OB-GYN clinic for her pregnancy. (Doc. 31, att. 3 at 3; att. 6 at 9).

On September 3, 2005, Plaintiff began to experience vaginal bleeding, which she reported to a correctional officer. (Doc. 8 at 6). According to Plaintiff, the officer called for assistance over the loudspeaker, but the CMS nurse, Defendant Brown, did not arrive for approximately thirty minutes. (Id.). After arriving, Defendant Brown first dispensed medication to the other inmates for approximately thirty to forty-five minutes before talking to Plaintiff. (Id.). When Plaintiff told Nurse Brown that she believed that she was having a miscarriage, Nurse Brown questioned whether she was pregnant because she was not receiving prenatal vitamins. (Id.). Nurse Brown left and returned with Plaintiff's chart which showed that she was pregnant, at which time he took her to the CMS clinic. (Id. at 7). The medical staff in the CMS clinic informed Dr. Isom of Plaintiff's complaints, and he ordered that she be housed in the clinic and monitored for any bleeding. (Doc. 31, att. 4 at 24). Later that day, the staff informed Dr. Isom that Plaintiff was bleeding, and he ordered that she be transferred to the University of South Alabama ("USA") Medical Center emergency room. (Id.).

Metro Jail personnel transported Plaintiff to the emergency

3

room, and she was admitted to the hospital at 12:45 a.m. on September 4, 2005, for a cyst on her right ovary, a large mass on her left ovary, and a possible ectopic pregnancy. (Doc. 31, att. 3 at 4; Doc. 31, att. 4 at 24). USA surgeons subsequently ruled out an ectopic pregnancy and determined that Plaintiff had suffered an "incomplete abortion" or miscarriage at nine weeks gestation. (Doc. 38, att. 1 at 36, 56, 74).

Following a D&C (dilatation and curettage) and a diagnostic laparoscopy, Plaintiff was discharged on September 5, 2005, and returned to the Metro Jail with instructions to return if she experienced a significant increase in vaginal bleeding, a temperature exceeding 100.4 degrees, or uncontrolled pain. (Id. at 36, 57-58). Plaintiff's medications on discharge were Tylox, Phenergan, and Phenobarbitol. (Id.; Doc. 31 att. 4 at 23).

Upon return to the Metro Jail, Plaintiff was housed in the CMS clinic where the staff changed the dressing on her two surgical wounds and ordered her medications. (Doc. 31, att. 3 at 4). The following day, September 6, 2005, Plaintiff complained of chest wall pain, and Dr. Isom ordered that she be taken again to the USA emergency room, where she was given Zithromax and Motrin for an upper respiratory infection. (Id.). Plaintiff was discharged the same day with instructions to follow up with her primary physician, continue taking Zithromax and Motrin, and drink plenty of fluids. (Doc. 31, att. 4 at 28-30). Upon return

to the Metro Jail, Plaintiff was housed in the CMS clinic where she was attended for two days by the CMS nurse and physician. (Doc. 31, att. 3 at 4; Doc. 31, att. 4 at 24-25, 31).

Five days later, on September 11, 2005, Plaintiff complained of right lower quadrant pain with sporadic vaginal bleeding. (Doc. 31, att. 3 at 4).  Dr. Isom again ordered that Plaintiff be taken to the USA emergency room where she was examined but not admitted to the hospital.  (Id.; Doc. 31, att. 4 at 36). Plaintiff was discharged and instructed to take Tylenol and Miralax, to follow up with the Mostellar Clinic, and to return "for increased pain, persistent vomiting, [temperature] over 101, or any acute changes."  (Doc. 38, att. 1 at 42).

Upon return to the Metro Jail at 3:00 a.m. on September 12, 2005, Plaintiff was housed in the CMS clinic and attended by the CMS nurse and physician.  (Doc. 31, att. 3 at 4; Doc. 31, att. 4 at 36).  Plaintiff complained of pain at the surgery site and was given pain medication.  (Id.).  Later that same day, Plaintiff began bleeding at the surgery site and was again taken to the USA emergency room, where she was admitted for incision drainage and fever and treated with antibiotics.  (Doc. 31, att. 3 at 5; Doc. 38, att. 2 at 42, 45).  Two days later, on September 14, 2005, Plaintiff had no drainage and was discharged with a good prognosis.  She was instructed to take Augmentin and to notify the doctor in the event of a temperature exceeding 100.4 degrees,

5

severe abdominal pain, purulent discharge, or any other acute changes. (Doc. 31, att. 4 at 42; Doc. 38, att. 2 at 45-46). Plaintiff was also instructed to follow up with Dr. J. Grace in one week. (Doc. 38, att. 2 at 46-49). Upon return to the Metro Jail, Plaintiff was housed in the CMS clinic, and Dr. Isom ordered Augmentin, Tylenol, wound care, and dressing. (Doc. 31, att. 3 at 5). Plaintiff remained in the clinic for two more days for wound care and observation. (Id.). Dr. Isom changed Plaintiff's antibiotic to Amoxicillin on September 16, 2005. (Id.).

On September 17, 2005, three days after being discharged from USA hospital, Plaintiff complained of chest pains and was again taken to the USA emergency room. (Id.). Plaintiff was examined and discharged the following day, September 18, 2005, with instructions to continue wound care, take antibiotics, and follow up with a physician if her symptoms continued. (Doc. 31, att. 10 at 5). After Plaintiff returned to the Metro Jail, the CMS staff scheduled an appointment for her with an outside gynecologist. (Doc. 31, att. 6 at 13).

On September 22, 2005, Plaintiff complained of drainage and pain around the incision site. Dr. Isom ordered continuing wound care and an appointment with the surgery clinic. (Doc. 31, att. 3 at 5).

On October 6, 2005, Dr. Grace at the USA OB-GYN clinic

examined Plaintiff and noted that one incision site was completely healed and that the other was healing well. (Doc. 31, att. 3 at 5). Dr. Grace noted significant contact dermatitis from the adhesive tape on the bandages, and she prescribed Betamethasone cream. (Id.; Doc. 31, att. 5 at 5). Dr. Isom prescribed Triamcinolone cream for Plaintiff's contact dermatitis. (Doc. 31, att. 3 at 5; Doc. 31, att. 6 at 15).

Two days later, on October 8, 2005, Plaintiff complained of abdominal pain and dizziness, and a correctional officer issued a "code 80" emergency call to the CMS staff. (Doc. 31, att. 3 at 5). Plaintiff was examined and housed in the CMS clinic. (Id.).

Plaintiff made additional complaints on October 9, 2005, October 13, 2005, and October 19, 2005, ranging from incision pain, to back pain, to difficulty urinating. (Id.). CMS responded to each complaint. CMS staff administered a urinalysis and antibiotics and noted that the incisional scar was "well healed" and "nontender." (Id.; Doc. 31, att. 5 at 13). In addition, on October 20, 2005, Plaintiff was given an x-ray of her lumbar spine, which was "normal." (Id. at 22). On October 24, 2005, Plaintiff was seen by a psychiatrist for depression. (Doc. 31, att. 3 at 6).

On October 25, 2005, Plaintiff complained of a bruise on her back, and, on October 27, 2005, of tingling down her left leg. (Id.). Dr. Isom ordered another x-ray, which was normal, another

urinalysis, and Tylenol.  (<u>Id.</u>).

Plaintiff's complaints continued thereafter from November, 2005, to April, 2006, and CMS responded by treating Plaintiff for conditions including dermatitis, high blood pressure, surgery site drainage, psychiatric disorders, a fractured finger, and a urinary tract infection.  (<u>Id.</u>).  On April 20, 2006, Plaintiff transferred from the Metro Jail to Tutwiler prison.  (<u>Id.</u>).

## II.  PROCEDURAL ASPECTS OF THE CASE

On March 28, 2006, Plaintiff filed the subject § 1983 action in this Court.  (Doc. 1).  On July 19, 2006, the Court ordered Plaintiff to file an amended Complaint on the Court's complaint form for a § 1983 action, which she did on July 27, 2006.  (Docs. 7, 8).  In her Amended Complaint, Plaintiff seeks compensatory damages for "medical, physical, and mental damage" caused by Defendants' failure to properly treat, and delay in treating, her medical conditions.  (Doc. 8 at 5).

On May 14, 2007, and July 20, 2007, Defendants filed their Answers and Special Reports, denying any violation of Plaintiff's constitutional rights and asserting various defenses, including absolute and qualified immunity.[1]  (Docs. 29, 30, 31, 39, 40).

---

[1] As private entities, Defendants CMS, Sonnier, and Brown are not entitled to immunity, whether qualified or absolute.  <u>See</u> <u>Swann v. Southern Health Partners, Inc.</u>, 388 F.3d 834, 837 (11th Cir. 2004) ("The parties agree that as a private entity, SHP [a private corporation employed by the county to provide medical care to inmates at the county jail] is not entitled to assert a qualified immunity defense."); <u>Hinson v. Edmond</u>, 205 F.3d 1264,

The Court converted Defendants' Special Reports and Answers to a Motion for Summary Judgment on February 6, 2008. (Doc. 60). On April 12, 2007, June 1, 2007, January 24, 2008, February 21, 2008, and February 29, 2008, Plaintiff filed responses to the Answers and Special Reports, reasserting her Eighth Amendment claim against Defendants for inadequate and delayed medical treatment. (Docs. 22, 34, 58, 62, 64). Defendants' Motion for Summary Judgment and Plaintiff's responses thereto are now before the Court.

<u>III. SUMMARY JUDGMENT STANDARD</u>

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The <u>Federal Rules of Civil Procedure</u> grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'"

---

1265 (11th Cir. 2000) (a "privately employed prison physician . . . is ineligible to advance the defense of qualified immunity"); <u>Edwards v. Alabama Dep't of Corrs.</u>, 81 F. Supp. 2d 1242, 1254 (M.D. Ala. 2000) (a "private entity" contracting with a state to provide medical services to state inmates "is not entitled to qualified immunity...."). With respect to absolute immunity, Defendants have cited no case, and the Court is aware of no case, extending absolute immunity to privately employed medical companies or privately employed physicians and nurses providing medical services to state inmates.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting <u>Fed. R. Civ. P.</u> 56(c)).

The Court must view the evidence produced by "the nonmoving party, and all factual inferences arising from it, in the light most favorable to" that party.  <u>Barfield v. Brierton</u>, 883 F.2d 923, 934 (11th Cir. 1989).

However, Rule 56(e) states that:

> an adverse party [to a motion for summary judgment] may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

<u>Fed. R. Civ. P.</u> 56(e); <u>see also</u> <u>Celotex Corp.</u>, 477 U.S. at 325-27.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (internal citations omitted).  "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  <u>Custom Mfg. & Eng'g, Inc. v. Midway Servs.,</u>

10

<u>Inc.</u>, 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).


IV. DISCUSSION

In this action, Plaintiff seeks redress for an alleged
constitutional deprivation pursuant to 42 U.S.C. § 1983.  Section
1983 provides in pertinent part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State or Territory or the District of
> Columbia, subjects, or causes to be
> subjected, any citizen of the United States
> or other person within the jurisdiction
> thereof to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law, suit in
> equity, or other proper proceeding for
> redress. . . .

42 U.S.C. § 1983 (1994).

The Court construes Plaintiff's Complaint against Defendants
as asserting a violation of her rights under the Eighth Amendment
for Defendants' failure to properly treat her various medical
conditions while she was incarcerated at the Mobile County Metro
Jail.  Specifically, Plaintiff alleges that: (1) Dr. Sonnier
prescribed Dilantin for her seizure disorder, to which she had an
allergic reaction, causing her to itch severely and possibly
causing her miscarriage; (2) Nurse Brown delayed for an hour and
forty-five minutes before responding to Plaintiff's complaint
that she was bleeding vaginally, thereby possibly contributing to
her miscarriage; and (3) CMS staff failed to administer

antibiotics and proper wound care after Plaintiff was discharged from the hospital following a D&C and diagnostic laparoscopy, resulting in an infection at the surgery site.  (Doc. 8 at 2-3, 6-9).

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs."  Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)).

To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively

12

serious medical need." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Id.</u> (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." <u>Id.</u> (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must further demonstrate "deliberate indifference" to a serious medical need. <u>Farrow</u>, 320 F.3d at 1243.

> In <u>Estelle</u>, the Supreme Court established that "deliberate indifference" entails more than mere negligence. <u>Estelle</u>, 429 U.S. at 106, 97 S. Ct. 285; <u>Farmer</u>, 511 U.S. at 835, 114 S. Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting <u>Farmer</u> and <u>Estelle</u>, this Court explained in <u>McElligott</u> that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious

13

> harm; (2) disregard of that risk; (3) by
> conduct that is more than mere negligence."
> <u>McElligott</u>, 182 F.3d at 1255; <u>Taylor</u>, 221
> F.3d at 1258 (stating that defendant must
> have subjective awareness of an "objectively
> serious need" and that his response must
> constitute "an objectively insufficient
> response to that need").

<u>Farrow</u>, 320 F.3d at 1245-46.

In addition, where Plaintiff complains of delay in medical treatment, she has the burden of establishing that she suffered a significant effect from the delay.  <u>See</u> <u>Hill</u>, 40 F.3d at 1188. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed."  <u>Id.</u> (emphasis added).

Having established the applicable legal principles, the Court will consider each of Plaintiff's claims in turn.

A. <u>Plaintiff's Claim Against Dr. Sonnier</u>.

Plaintiff claims first that Dr. Sonnier prescribed Dilantin for her seizure disorder and that she had an allergic reaction to the medication, resulting in severe itching.  (Doc. 8 at 4). Plaintiff acknowledges that she did not report an allergy to Dilantin to Dr. Sonnier or the CMS staff at her initial medical screening because she had never taken the medication before, and she did not know that she was allergic to it.  (Doc. 34 at 3, 5). Plaintiff states that she unilaterally discontinued the

14

medication because of the severe itching.  (Doc. 8 at 2).

While the Court is satisfied that Plaintiff experienced an allergic reaction to Dilantin, as she claims, she has failed to show that her severe itching was a medical condition "that, if left unattended," posed "a substantial risk of serious harm" to her health or safety.  <u>Farrow</u>, 320 F.3d at 1243 (citations omitted).  Therefore, Plaintiff has failed to meet the objective element of her Eighth Amendment claim with respect to this medical condition.

Plaintiff also claims that her use of Dilantin may have caused or contributed to her subsequent miscarriage.  However, there is no medical evidence in the record to support any relationship between Plaintiff's use of Dilantin and her miscarriage.  To the contrary, Dr. Sonnier testified by affidavit that Dilantin is not abortifacient.  (Doc. 32, att. 2 at 2).

In any event, assuming, *arguendo*, that Plaintiff's use of Dilantin posed a substantial risk of serious harm to her health or pregnancy, she has failed to show that Dr. Sonnier knew of the risk and disregarded it "by conduct that is more than mere negligence."  <u>Farrow</u>, 320 F.3d at 1245-46.  Therefore, Plaintiff has failed to meet the objective and subjective elements of her Eighth Amendment claim with respect to her use of Dilantin.

Plaintiff also argues that Dr. Sonnier was negligent in failing to order an ultrasound when he examined her on August 15,

2005, three days after she arrived at the Metro Jail, which would have revealed the cysts on her right and left ovaries, which, if removed, may "possibly" have prevented the miscarriage. (Doc. 34 at 4).  The record shows that, on August 15, 2005, Dr. Sonnier examined Plaintiff in response to her complaints of lower back pain.  He ordered a urinalysis to check for a bladder infection, which was negative, and he conducted a pelvic exam, which he found to be normal.  (Doc. 31, att. 2 at 2).

First, there is no medical evidence in the record to suggest that the presence of the cysts caused or contributed to the miscarriage or that their removal would have prevented the miscarriage.  Therefore, Plaintiff has failed to show that the cysts constituted a medical condition "that, if left unattended," posed "a substantial risk of serious harm" to her health or safety.  <u>Farrow</u>, 320 F.3d at 1243 (citations omitted).

Second, assuming, *arguendo*, that the cysts did pose a risk of serious harm to Plaintiff's health or pregnancy, there is no evidence that Dr. Sonnier knew of the risk and disregarded it "by conduct that is more than mere negligence."  <u>Farrow</u>, 320 F.3d at 1245-46.  Indeed, even if the Court were to assume that the cysts caused the miscarriage, of which there is no evidence, and that Dr. Sonnier was negligent for not discovering the cysts, it is well established that "[s]imple medical malpractice . . . does not rise to the level of a constitutional violation."  <u>Waldrop v.</u>

16

Evans, 871 F.2d 1030, 1035 (11th Cir. 1989).  Therefore, Plaintiff has failed to meet the objective and subjective elements of her Eighth Amendment claim against Dr. Sonnier with respect to each of her medical conditions, and he is entitled to judgment as a matter of law.

B. Plaintiff's Claim Against Nurse Brown.

Next, Plaintiff claims that Nurse Brown delayed in responding to the call from a correctional officer that she was experiencing vaginal bleeding and possibly having a miscarriage. (Doc. 8 at 6).  Plaintiff claims that it took approximately thirty minutes for Nurse Brown to arrive at her dorm after being called, and then he dispensed medication to the other inmates before talking to her.  (Doc. 8 at 6).  According to Plaintiff, Nurse Brown delayed a total of one hour and forty-five minutes before taking her to the CMS clinic, in part because he did believe that she was pregnant.  Once at the clinic, Plaintiff was observed for approximately one hour before being taken to USA hospital where she was told that she had already had a miscarriage.  (Doc. 8 at 7; Doc. 22 at 8; Doc. 31, att. 3 at 4 and att. 4 at 24).  Plaintiff was nine weeks pregnant at the time.  (Doc. 38, att. 1 at 56, 74).

Plaintiff argues that Nurse Brown's delay in responding to her initial request for medical assistance caused or contributed to her subsequent miscarriage, thereby violating the Eighth

17

Amendment.  However, as discussed above, "[a]n inmate who
complains that delay in medical treatment rose to a
constitutional violation must place *verifying medical evidence* in
the record to establish the detrimental effect of delay in
medical treatment to succeed."  Hill, 40 F.3d at 1188 (emphasis
added).  There is no medical evidence whatsoever in this action
to support Plaintiff's claim that her miscarriage could have been
avoided if, after Plaintiff complained of vaginal bleeding, she
had been taken immediately to the CMS clinic or the hospital.  To
the contrary, Dr. Sonnier testified that, "if a patient develops
pregnancy-related complications during the first trimester of a
pregnancy, there is little that can be done from a medical
standpoint to save the fetus." (Doc. 31, att. 2 at 2).  Given
the absence of "verifying medical evidence" that Nurse Brown's
delay in responding to Plaintiff's complaints of vaginal bleeding
caused or contributed to her miscarriage, Plaintiff's claim
against Defendant Brown fails as a matter of law.

     C. Plaintiff's Claim Against CMS.

     Plaintiff next claims that Defendant CMS is also liable for
Nurse Brown's delay in responding to Plaintiff's initial request
for medical assistance on September 3, 2005.  (Doc. 8 at 3).  As
discussed above, because Plaintiff has failed to submit verifying
medical evidence that Nurse Brown's delay detrimentally affected
her medical condition, this claim fails as a matter of law.

In addition, Plaintiff claims that CMS is responsible for
the failure of the medical staff at the jail to properly
administer antibiotics prescribed to her when she was discharged
from the hospital following treatment for an infection.  (Id. at
8).  In order to state a claim upon which relief can be granted
in a § 1983 action, Plaintiff must establish a causal connection
between each defendant's actions, orders, customs, policies, or
breaches of statutory duty and the alleged deprivation of her
constitutional rights.  Boglin v. Weaver, 2001 WL 228172, *14
(S.D. Ala. 2001) (unreported).  Stated differently, CMS's
liability for the constitutional violation alleged by Plaintiff
cannot be established on the basis of a theory of *respondeat
superior*.  See Edwards v. Alabama Dep't of Corrs., 81 F. Supp. 2d
1242, 1255 (M.D. Ala. 2000) ("In order to prove that CMS should
be liable, the plaintiffs would have to demonstrate that CMS
itself directly caused the violation of their constitutional
rights through their adoption of some official policy or
practice. . . .  A theory of *respondeat superior* is not
sufficient to support their § 1983 claim. . . .") (citations
omitted).  See also Case v. Riley, 2008 WL 764560, *2 (11th Cir.
2008) (unreported); Pinkney v. Davis, 952 F. Supp. 1561, 1569
(M.D. Ala. 1997) ("[P]laintiff must show that the physicians and
medical personnel, in providing constitutionally inadequate
treatment to the plaintiff, were implementing official [company]

19

policy or unofficial customary practice.").

In addition, "plaintiff must show that the policy or custom was the 'moving force [behind] the constitutional violation.'" Pinkney, 952 F. Supp. at 1569 (citations omitted). "[I]t is clear that not only must there be some degree of 'fault' on the part of [the company] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." Id. (citations omitted).

Assuming, *arguendo*, that the medical staff at the jail failed to properly administer Plaintiff's prescribed antibiotics, Plaintiff has failed to establish, or even allege, any policy of CMS which caused this alleged constitutional violation.[2]  Given the absence of evidence of a causal connection between the actions of Defendant CMS and the alleged constitutional deprivations,[3] Plaintiff's claim fails as a matter of law.

_____

[2] Plaintiff's medical records show that she regularly received prescribed medications during her incarceration at the Metro Jail.  While the record is unclear whether Plaintiff received the antibiotic "Z-pak" prescribed upon discharge from the hospital on September 6, 2005, her medical records show that she was given the antibiotics prescribed on September 14, 2005. (Doc. 38 att. 1 at 18-26; Doc. 31, att. 4 at 28-30, 42; Doc. 38, att. 2 at 45-46; Doc. 31, att. 3 at 5; Doc. 31, att. 5 at 13). Assuming that the medical staff at the jail failed to administer some of Plaintiff's antibiotics, there is no evidence that their failure was anything other than mere negligence, which is insufficient to establish an Eighth Amendment violation.  See Farrow, 320 F.3d at 1245.

[3] It should be noted that Plaintiff has likewise failed to establish any policy of CMS that caused Nurse Brown to delay in

V.   CONCLUSION

The Eleventh Circuit has recognized that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop, 871 F.2d at 1035.  The fact that a Plaintiff may disagree with the efficacy of the treatment recommended or simply prefer a different course of treatment does not state a valid claim of medical mistreatment under the Eighth Amendment.  See, e.g., Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) ("the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment.") (quoting Estelle, 429 U.S. at 107); Del Muro v. Federal Bureau of Prisons, 2004 WL 1542216, *4 (N.D. Tex. 2004) (unreported) ("It is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs.").

While the Court recognizes that Plaintiff experienced a serious and traumatic loss as a result of her miscarriage, her own medical records show that she received extensive medical treatment for her pregnancy and other ailments by Dr. Sonnier and

responding to Plaintiff's initial request for medical assistance.

the CMS staff while incarcerated at the Metro Jail.  She was
taken to the USA hospital emergency room no less than five times
between September 3, 2005, and September 17, 2005, for complaints
of bleeding or pain.  (Doc. 31, att. 4 at 24, 36; Doc. 31, att. 3
at 4-5).  She was housed in the CMS clinic repeatedly for
monitoring during her pregnancy and during the complications
following her miscarriage, and she was taken to private
physicians as well.  (Doc. 31, att. 4 at 24-25, 31, 36; Doc. 31,
att. 3 at 4-5).  While the Court does not condone Nurse Brown's
delay in responding to Plaintiff's initial complaint that she was
bleeding vaginally and believed she was having a miscarriage,
there is no verifying medical evidence that the delay had a
detrimental effect on Plaintiff's medical condition.

Based on the foregoing, it is recommended that the Motion
for Summary Judgment of Defendants Sonnier, Brown, and CMS (Docs.
29, 30, 31, 39, 40) be granted, that Plaintiff's action be
dismissed with prejudice, and that judgment be entered in favor
of Defendants on all claims.

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.  Objection.  Any party who objects to this recommendation or
anything in it must, within ten days of the date of service of this
document, file specific written objections with the clerk of court.
Failure to do so will bar a de novo determination by the district
judge of anything in the recommendation and will bar an attack, on
appeal, of the factual findings of the magistrate judge.  See 28

U.S.C. § 636(b)(1)(C); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988); <u>Nettles v. Wainwright</u>, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).   The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   <u>Transcript (applicable where proceedings tape recorded)</u>. Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 2nd day of May, 2008.

s/Bert W. Milling, Jr.

UNITED STATES MAGISTRATE JUDGE